Edmund Stephen, Administrator, Appellee, v. Joseph
J. Duffy, Appellant.

Gen. No. 5,000.

1. MASTER AND SERVANT—*duty to furnish safe place to work.* It
is the duty of a master to provide for his employes, so far as the
work at which such master is engaged will permit, a reasonably
safe place to work, and if the place may become dangerous by
reason of perils arising from the doing of other work pertaining
to the master's business different from that in which the particular
servant is engaged, to give him such warning of the additional
dangers as will enable him in the exercise of reasonable care to
avoid them or to guard against them. Whatever means may be
employed, it is the duty to employ them.

2. MASTER AND SERVANT—*when risk not assumed.* A servant
does not assume a risk which arises from the performance by his
master of other work with which he, such servant, is in no wise
connected.

3. MASTER AND SERVANT—*when rule of res ipsa loquitur applies
between.* If the servant is entitled to receive from his master the
same measure of protection which the master owes to the public
at large, the rule of *res ipsa loquitur* applies in favor of the servant,
if it would apply in favor of the public, and such rule does apply
where the injury to the servant results from an accident resulting
from the employment by the master of dyamite used in connection
with work other and different from that in which the servant was
engaged.

4. EVIDENCE—*when expert testimony competent.* Expert testi-
mony is competent with respect to the appearance of stone after it
was blasted with dynamite, and as to the effect of such explosions
and the ability of experts to discover whether some of the charges
of dynamite had failed to explode.

Action in case for death caused by alleged wrongful act. Appeal
from the Circuit Court of Will county; the Hon. DORRANCE DIBELL,
Judge, presiding. Heard in this court at the April term, 1908.
Affirmed. Opinion filed August 10, 1908.

J. L. O'DONNELL and T. F. DONOVAN, for appellant;
R. J. FOLONIE, of counsel.

JOHN W. D'ARCY, for appellee.

MR. PRESIDING JUSTICE THOMPSON delivered the opinion of the court.

Appellee sued appellant in the Circuit Court of Will county to recover damages for the benefit of the next of kin, because of the death of Alfred Oestry, alleged to have been caused on December 26, 1904, by the negligence of Joseph J. Duffy, appellant, and others.

At a former trial, at the close of appellee's evidence, the court instructed a verdict for the present appellant. On appeal to this court that judgment was reversed and the cause remanded for a new trial. 136 Ill. App. 572. On the second trial in the Circuit Court the jury returned a verdict against the appellant, Joseph J. Duffy, assessing appellee's damages at $5,000, and finding the other defendants not guilty. Joseph J. Duffy appeals from that judgment.

No point is made or argued as to the giving or refusing of instructions, nor is any serious question argued in regard to the admission or rejection of evidence. The main questions argued are that the verdict cannot be sustained upon the evidence because the specific negligence which caused the death of the intestate has not been proved and that the cause of the death of the intestate was an assumed risk.

The former opinion of this court stated the case as it then appeared. The evidence is slightly changed from that on the former trial and there is some additional evidence both on the part of appellee and appellant in the record.

The appellant was engaged in excavating and removing solid limestone rock from the drainage channel of the Sanitary District of Chicago, in the township of Lockport, in Will county. The ledge of rock was being removed to a depth of twelve feet. The method of removal was to cut the outer edge of the channel with machines known as channelers to below the bottom of the ditch, then drill four rows of holes, the holes being about six feet apart in the rows and the rows about eight feet apart, the first row being six or eight feet

back from the face of the rock. The holes were drilled to a depth of twelve to fourteen feet and were from one and a half to two inches in diameter, but were enlarged at the bottom by springing them with light charges of dynamite, making a small excavation at the bottom of each hole. Each hole was then charged with from twenty-five to forty pounds of dynamite, the dynamite being in sticks weighing from half a pound to a pound each. An exploder, which is a small copper cap containing some kind of explosive that can be discharged with electricity, was inserted in a small hole in the last stick of dynamite, and then inserted in each hole amongst the other sticks of dynamite. Electric wires connecting with this exploder are run through and around the stick of dynamite in which the exploder is inserted, so that the exploder and dynamite may not become separated. The exploder is covered with a substance resembling sulphur to keep it dry; the hole in the dynamite over the exploder is also filled with soap or some greasy substance to keep water from getting into the exploder. A general wire connects a series of small circuits with a battery; separate circuits are made of every four holes. The rows of holes are all discharged at the same time, the discharge breaking up the rock and heaving it some four feet above its natural level.

The rock, after being broken up by the dynamite, was loaded by means of a steam shovel into cars. The deceased, at the time he was killed, and for two months prior thereto, was in the employ of the appellant operating the crane on the shovel. The men engaged on the shovel had nothing to do with the men who drilled and charged the holes and exploded the dynamite. The holes had been drilled, charged and exploded at the place where the deceased was killed about three days before the day of the accident, while the steam shovel was working about half a mile from where the drilling and blasting was being done. At the time of the accident the deceased and other employes in charge of the shovel were working at removing the broken stone and

had loaded several cars, having worked that morning from about seven o'clock until ten o'clock, the hour at which the deceased was injured, when the shovel came in contact with a charge of unexploded dynamite, causing an explosion which caused the death of Oestry, who was struck by a flying rock.

The declaration contains seven counts. In the first count the defendant is charged with being engaged in the work of blasting rock with dynamite and removing the rock, and with the duty of exercising reasonable care in properly placing and discharging the explosive material, so that the dynamite would be exploded when the electrical current used for that purpose was applied, or, if the dynamite was not exploded, with the duty of withdrawing it from said holes so as not to injure Oestry, when working with the shovel, and that the defendant, in violation of said duty, carelessly, in a negligent manner, connected said charges, etc., and carelessly neglected and allowed unexploded dynamite to remain in said holes without notice to the deceased, etc.

The second count alleges that it was the duty of defendant to use reasonable care in preparing and exploding dynamite in holes and to cause all the dynamite in said holes to be exploded or withdrawn therefrom before permitting the steam shovel to work in that portion containing dynamite unexploded, and to carefully inspect said premises after the explosion to ascertain if all the dynamite therein was exploded when the electrical current was applied thereto, and to withdraw all unexploded dynamite or give notice of the danger, and alleges negligence in the performance of said duty.

The third count alleges the negligence of the defendant in failing to provide Oestry with a reasonably safe place, etc. The remaining counts allege specific negligence in reference to the manner of charging the holes, insufficient exploder, frozen dynamite and other matters, the allegations concerning which it was essential the plaintiff should prove to sustain such counts.

The evidence showed that the deceased was working as a cranesman on a steam shovel engaged in loading broken rock into cars; that the cranesman was stationed on a stand on the engine midway of the boom; that the cranesman's duty was to direct the course of the shovel in the stone pile and after it was filled with rock to guide it to its proper position over the car and dump it; that the boom is thirty feet long and stands at an angle of forty-five degrees, so that the cranesman was elevated above the level from which the rock was taken by the shovel; that when the fourth car was being loaded on the morning of the accident, an explosion occurred in the pile of rock at the place where the shovel was being forced into the pile; that this explosion was like explosions in work where dynamite is being used for blasting and threw stone all around, one piece striking appellee's intestate, causing his death; that the explosion broke the bail on the dipper of the shovel, the bail being made of iron eight inches wide and two and one-half inches thick; that flying rock from the explosion took the corner off a top buggy that was being driven over a bridge one hundred feet or more distant, and a rock weighing twenty pounds fell in front of the horse. Witnesses who saw the explosion say there must have been twenty-five pounds of dynamite exploded at that time, from the appearance and effect of it; that the blasting had been done by the employes of appellant with dynamite about three days before the injury; that the blasting was done by exploding dynamite in a large number of holes at the same time; the ledge blasted was about 100 feet long and 30 feet wide; that no work had been done at the place where the explosion occurred between the time of blasting and the morning of the accident; and that a steam shovel loading stone from a bank in which there was dynamite would cause the dynamite to be exploded by attrition or by forcing the dipper or stones against it.

The evidence is conflicting upon the question whether

persons skilled in the use of dynamite could, by investigation, discover if any of the charges in the holes had failed to explode. Thomas McHugh, a witness engaged in rock excavation for a number of years and in the use of dynamite, testified that where a large number of holes are fired from a battery "If one of the holes neglected to go, he could tell where that hole was that didn't go," that a center hole that failed to explode would leave a depression; and that "where holes are six feet apart one way and eight feet apart another and the bank is loosened up in the manner indicated, an unexploded hole could certainly be discovered by a person who was experienced in inspecting work of that kind; that "if there were four holes unexploded anybody could tell then. Not a bit of danger of him (an experienced man) not knowing it."

John Romano, a contractor having seventeen years' experience with dynamite, testified that on examination there would be indications to the foreman that one hole had not exploded, that if a circuit of four holes failed to explode it would leave more or less solid rock; that the more holes were exploded at the same time the more difficult it would be to tell whether any had failed to explode, and that if holes charged with dynamite six or seven feet apart and twelve or fourteen feet deep were exploded a person experienced in inspecting work of that kind could discover an unexploded hole.

McGinnis, the engineer in charge of the steam shovel on which Oestry worked for appellant, and on which he was killed, testified that there was no notice of danger given before the explosion; that if four or five holes missed you would notice it, because the rock would not be thrown up, it would be solid, but that he had never observed where one hole was missed; "that I never inspected it on any work I was ever on;" that there were indications that other holes had failed to explode in that same battery, besides the one the explosion of which killed Oestry; that they discovered one the next day where some sixteen sticks of dynamite were found

unexploded, five or six feet from where the explosion happened that killed Oestry; and that this was the first explosion that occurred on the work caused by a shovel while Oestry was his cranesman.

Howard Blackburn, a man of experience in the use of dynamite, who was assistant superintendent of the work, testified that the holes were eight feet apart and sixteen feet deep and that they would blow up twenty-five holes more or less at a time; that "where holes are eight feet apart each way it could be observed from the surface if one of the holes remained, unexploded;" "that if four holes remained unexploded there would be no difficulty; that on a few occasions in going over the work he saw evidences of unexploded dynamite; that the rock would be solid and the wire would be sticking up; that from May, 1904, up to the time of the injury there were no explosions of any kind on account of the steam shovels coming in contact with dynamite."

It was also proved without any contradiction that if the holes were exploded one row at a time there would be no difficulty in discovering any charge that missed exploding.

It was proved on the part of appellant, by his superintendent, that missed holes which had failed to explode had been taken out before while the deceased was on the work; that missed holes were sometimes found once or twice a week, and these missed holes were sometimes discovered by the shovel-man; that if a battery of holes like the one used to break up this rock was exploded and one hole failed to explode he would not be able to discover it, and that there was nothing unusual about the appearance of this rock after the blast, that there were no marked depressions more than ordinary, nothing indicating a missed hole. There was proof that the charge of dynamite in any of the holes or small circuits might fail to discharge because of any one of a number of reasons, such as if the fulmanite in the exploder should get wet or be defective, or if the electric circuits should be too weak or be

broken by the wire becoming detached from the exploder, or the dynamite should be frozen, and that some of the charges might be exploded and others not, but the particular reason for the failure to explode could not be told. There was also proof that there was water in some of the holes when the drilling was done in this battery, and that it was cold weather when these holes were loaded with dynamite, and that the dynamite was thawed out before being put in the holes.

It is a matter of common knowledge that the use of dynamite as an explosive is intrinsically dangerous. "It is the duty of the master to provide for his employes, so far as the work at which he is engaged will permit, a reasonably safe place to work, and if the place may become dangerous by reason of perils arising from the doing of other work pertaining to the master's business different from that in which the particular servant is engaged, to give him such warning of the additional danger as will enable him in the exercise of reasonable care, to avoid them or to guard against them. Whatever means may be employed, it is the duty of the master to employ them." Felice v. N. Y. C. & H. R. R. Co., 14 App. Div. (N. Y.) 345. The more dangerous the means are that are employed by a master to accomplish the work he is engaged in, the greater the care and diligence is required to fulfill the duty of ordinary care that is required of the master to furnish the employe a safe place. The care of the master must be proportionate to the dangerous means employed by him, in order to constitute reasonable care. The deceased was in no way connected with the employes who did the drilling, the charging the holes with dynamite, or the firing of the charges. The dangers to which the deceased was exposed were only the dangers of working with the machinery connected with a steam shovel. The death of the deceased was occasioned by the explosion of dynamite that was in the pile of rock. This danger was in no way incident to his employment. The deceased was entitled to the same

protection against injury from dynamite that a person not an employe was entitled to. In I. C. R. R. Co. v. Phillips, 55 Ill. 194, it was held that "the mere fact that a boiler exploded was *prima facie* evidence of negligence, and that the burden of disproving the negligence was thrown on the company." This rule was approved in Schaller v. Independent Brewing Co., 225 Ill. 492, where it was said: "It does not appear from the judgment and record of the Appellate Court that said court held proof of the explosion was not *prima facie* evidence of negligence, as contended by appellant. Such proof in any event, is not conclusive, but is only *prima facie* evidence, and may be rebutted by other testimony." In John Morris Co. v. Burgess, 44 Ill. App. 39, it was held that when a bystander is injured, the explosion of a boiler is *prima facie* evidence of negligence. In P., C., C. & St. L. R. R. Co. v. Campbell, 116 Ill. App. 356, it was held that from an injury resulting to plaintiff an employe while riding on a work train into the rear of which another train ran, the doctrine of *res ipsa loquitur* applied, and negligence upon the part of the defendant in such instance will be presumed. It is urged in behalf of appellant that it was incumbent on appellee to prove the particular act that was the cause of the dynamite not having exploded when the rock was blasted. In Armour v. Golkowska, 202 Ill. 144, where plaintiff was injured by a barrel falling from an unprotected platform, it was held not indispensable to her right of recovery that she show the cause of the fall of the barrel, or that it was not caused by the force of nature, or by some person unconnected with the defendant. In this character of cases there is a principle involved that distinguishes them from cases where an employe is injured by the agency or machinery with which he is working. In the latter case the employe has within his knowledge the means of proving the cause of his injury, while in the former the employe ordinarily is in entire ignorance of the cause of the

accident, and the means of proof are entirely within the power of the master.

In the case of Chicago U. Tr. Co. v. Giese, 229 Ill. 260, the rule applicable to cases of this kind is clearly announced: "When the thing which has caused an injury is shown to be under the management of the party charged with negligence, and the accident is such as in the ordinary course of things does not happen after those who have the care and management use proper care, the accident itself affords reasonable evidence in the absence of an explanation by the party charged, that it arose from the want of proper care. This rule of law results from the maxim *res ipsa loquitur*. Many cases are to be found illustrating the application of this rule. In some of them it is said that the rule is an exception to the general rule that negligence will never be inferred, while in others it is not treated as an exception but is treated as an evidentiary rule, under which the charge of negligence is regarded as proven, *prima facie,* by the proof of facts showing that the thing which caused the injury was under the management and control of the defendant or his servants, and that the accident is such as in the ordinary course of things does not happen if those who have the management use proper care." The concise rule is that the circumstances surrounding a case, where the maxim *res ipsa loquitur* applies, amount to evidence from which the fact of negligence may be found.

To apply the rule contended for by appellant and say that one injured as appellee's intestate was cannot recover, unless he affirmatively proves in the first instance the specific act of negligence of the appellant which caused the injury would, in many cases, be a denial of a right to recover at all, no matter how negligent the appellant might be. The evidence offered showed that by a proper inspection by competent and skilled men, the fact would have been discovered that some of the charges had failed to explode. It was the appellant's duty to inspect and know if any of the holes

loaded with dynamite remained unexploded, and if so to remove it to prevent injury to the steam shovel crew. Harp v. Cumberland T. & S. Co., 80 S. W. R. 511; Lanza v. La Grange Quarry Co., 124 Ia. 659; Reilly v. Erie Ry. Co., 177 N. Y. 547.

This case is one in which, when the peculiarly dangerous agency used by the appellant is considered, and with which the deceased had no connection in handling or working, the simple fact that he was killed by an explosion and that another gang or employes of defendant had blasted with dynamite, the rock with which the deceased was killed, but three days previous to the explosion that caused the injury, and that witnesses who saw the explosion testify that it had the appearance and effect of an explosion of dynamite, were sufficient to raise a presumption of negligence from which the jury might reasonably find that the appellant was guilty of the negligence alleged. In such case the appellee was entitled to a verdict unless the presumption of negligence proved was rebutted. The jury found that that presumption of negligence was not balanced by the appellant's evidence, and we cannot say upon a review of all the evidence that the jury were mistaken.

The remaining question argued is: that the cause of the death of the deceased was an assumed risk. The proof shows that no explosion had occurred on this work before while a steam shovel was digging on the rock; this was the first explosion that had occurred. The deceased did not assume the risk of an injury caused by the neglect of the appellant, and which would not have occurred had the appellant used ordinary care to guard his employes by properly inspecting the work to see that none of the charges of dynamite had failed to explode, and if any had failed to explode, to remove them or warn the employes of their danger. The facts that dynamite had been discovered and taken out, or that the shovel at other times may have uncovered dynamite, which, because of some unknown cause, had

failed to explode, do not excuse the negligence of appellant. Appellee only assumed the risks which are naturally incident to the working of the steam shovel. The risk of an explosion caused by dynamite placed in the rock by appellant was not an assumed risk.

The only assignment of error presented regarding the admission of evidence, is a ruling of the court on an objection to the opinion of witnesses, who were permitted to testify as experts concerning the appearance of stone after it was blasted with dynamite, and as to the effect of such explosions and the ability of experts to discover where some of the charges of dynamite had failed to explode. Dynamite is not a material in ordinary use and ordinary people have no technical knowledge or experience in the use of such a dangerous agency. The questions involved were proper subjects for expert testimony, and there was no error in the admission of such testimony.

The evidence is very conflicting and there is evidence on which the jury could reasonably find for the appellee. No error appearing in the case the judgment is affirmed.

*Affirmed.*

Mr. Justice Dibell having tried this case in the Circuit Court, took no part in this court.